JOHN N. BALCH AND OLGA G. BALCH, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 722–91, 723–91, 724–91, 725–91, 726–91.                    Filed April 12, 1993.

---

[13] No one from the Moore organization was called to testify.

[1] Cases of the following petitioners are consolidated herewith: Lawrence Howe and Ellen V. Howe, docket No. 723–91; Weston R. Christopherson and Myrna L. Christopherson, docket No. 724–91; Estate of Robert P. Dorsher, Deceased, Mary M. Dorsher, Executor, and Mary M. Dorsher, docket No. 725–91; and Richard G. Cline and Carole J. Cline, docket No. 726–91.

*Edward F. Michalak* and *Thomas C. Borders,* for petitioners.

*Mark H. Howard,* for respondent.

JACOBS, *Judge:* These consolidated cases result from respondent's determination that payments received by Messrs. John N. Balch, Lawrence Howe, Weston R. Christopherson, Robert P. Dorsher, now deceased, and Richard G. Cline (collectively referred to as petitioner husbands), formerly senior executives of Jewel Cos., Inc. (Jewel), in connection with the acquisition of Jewel by American Stores Co. (American Stores) constitute "excess parachute payments" within the purview of section 280G and are thus subject to the golden parachute payments excise tax imposed under section 4999. Under section 4999(c), the golden parachute payments excise tax is treated for tax assessment and collection purposes as an income tax. The amount of income tax deficiencies determined by respondent with respect to petitioner husbands and their wives (who are petitioners by virtue of having filed joint returns with their husbands) are as follows:

*John N. Balch and Olga G. Balch*
*Docket No. 722–91*

| Year | Deficiency |
|------|-----------|
| 1984 | $42,119 |
| 1985 | 9,000 |
| 1986 | 9,000 |

*Lawrence Howe and Ellen V. Howe*
*Docket No. 723–91*

| Year | Deficiency |
|------|-----------|
| 1984 | $105,082 |
| 1985 | 24,125 |
| 1986 | 11,000 |

*Weston R. Christopherson and Myrna L. Christopherson*
*Docket No. 724–91*

| Year | Deficiency |
|------|-----------|
| 1984 | $217,499 |
| 1985 | 67,000 |

*Estate of Robert P. Dorsher and Mary M. Dorsher*
*Docket No. 725–91*

| Year | Deficiency |
|------|-----------|
| 1984 | $61,578 |
| 1985 | 14,000 |
| 1986 | 16,700 |

*Richard G. Cline and Carole J. Cline*
*Docket No. 726–91*

| Year | Deficiency |
|------|-----------|
| 1984 | $160,920 |
| 1985 | 60,000 |

Unless otherwise stated, all section references are to the Internal Revenue Code in effect for the years in issue.

## FINDINGS OF FACT

We incorporate the stipulation of facts and attached exhibits. All petitioners resided in Illinois at the time their respective petitions were filed.

In mid-April 1984, a representative of American Stores contacted Jewel management concerning a possible business combination in which American Stores would acquire control of and eventually merge Jewel into itself. (Both Jewel and American Stores were engaged in selling food, drug, and general merchandise through their retail stores.) On May 29, 1984, Jewel management informed American Stores that they were not interested in a merger of the two companies.

On May 31, 1984, A.S. Acquisition Co. (A.S.) was incorporated by American Stores for the purpose of making a tender offer for Jewel.

On June 1, 1984, A.S. commenced a cash tender offer for Jewel common shares and Jewel preferred shares representing or convertible into a maximum of 10,300,000 Jewel common shares at $70 per share for the common stock and $49.91 per share for the preferred stock. Following its issuance, the tender offer was reviewed by Jewel's officers. Negotiations between representatives of Jewel and American Stores were held on June 13 and 14, 1984; the negotiations resulted in an increase in the amount of the tender offer, as well as severance pay agreements for senior Jewel executives, including petitioner husbands.

On June 14, 1984, the board of directors of Jewel formally met to consider the proposed merger agreement between Jewel and American Stores. The board approved the merger and authorized the execution of an Agreement of Merger (merger agreement). Pursuant to the merger agreement, the value of the consideration for the Jewel shares was increased to $75 for the common stock and to $53.47 for the preferred stock. At the June 14, 1984, meeting the Jewel board made amendments to various existing compensation arrangements and authorized severance pay agreements for Jewel's senior executives. On June 15, 1984, each petitioner husband executed a severance pay agreement. The stated purpose of each agreement was to induce the executive to remain in the employ of Jewel until such time as a change in control actually occurred. Each agreement provided that if the executive's employment was terminated as a result of a change in control, he would receive an amount equal to three times the sum of his annual salary and target bonus in effect on the date of change in control or in effect on the date of termination, whichever was greater.

On June 28, 1984, the amended tender offer expired. Through A.S., American Stores had acquired approximately 70.74 percent of Jewel's outstanding common stock and 72.63 percent of Jewel's outstanding convertible preferred stock. On July 12, 1984, American Stores announced that it had control of Jewel.

On July 12, 1984, Jewel entered into an amended severance pay agreement with its senior executives. The June 15 severance pay agreements (the original severance agreements) were amended in response to the "golden parachute" provisions contained in the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 67, 98 Stat. 495, 585-587 (sections 280G and 4999). At the time the original severance agreements were executed, Robert Berrey, general counsel of Jewel, and Thomas Sunday, general counsel of American Stores, thought section 4999 would apply only to agreements entered into after June 15, 1984. Subsequently, Messrs. Berrey and Sunday learned that the effective date of section 4999 was June 14, 1984.[2] They concluded that petitioner husbands would be taxed under section 4999 on the severance pay provided in the original severance agreements and that Jewel would lose its deduction under section 280G(a) for those payments. They decided that the best solution was to amend the original severance agreements and reduce the amounts of severance pay in order that such pay would not be deemed an excess parachute payment for purposes of sections 280G and 4999.

Mr. Berrey was aware that petitioner husbands hoped to be employed by American Stores. He believed that American Stores intended to compensate petitioner husbands for the reduction in severance pay under the amended severance agreements and told petitioner husbands that he thought American Stores intended to employ each of them. However, he warned them that they would have no right to any such employment under the amended severance agreements.

Mr. Sunday and Scott Bergeson, a senior vice president with American Stores, met with each of petitioner husbands to discuss amending the original severance agreements. Mr. Bergeson told each of them that American Stores intended to make a good faith effort to compensate them for the reduc-

---

[2] Secs. 280G and 4999 apply only to payments under agreements entered into, renewed, or amended in any significant relevant aspect after June 14, 1984, the effective date of secs. 280G and 4999. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 67(e), 98 Stat. 587.

tion in severance pay under the amended severance agreements. He told them that, to the extent possible, American Stores would offer them employment to make up for the reduction in severance pay.

According to Mr. Sunday's outline of topics discussed at that meeting:

I. Since 6-15, legislation has been passed that has made the payments provided for in the severance arrangements less attractive to you (excise tax) as well as to Jewel. Bob Berrey has told me you are amenable to amending that agreement to provide for the amount to be reduced to "safe harbor amount". It's also occurred to me that those arrangements make no provision for the continuation of the availability of expertise from senior executives that ASC may find useful in the future.

II. It'll take 1-2 months to put deal together & document it and to complete study of need—if, as we presently contemplate, your expertise is useful after that time, it is our present intention to sit with you to talk about some type of arrangement by which we can provide for your continuing service on a mutually agreed financial basis. We won't know until then & can't commit to anything now except that we'll discuss the matter with you and would anticipate a need to provide for such continuing availability, but no promises have been made. * * *

III. Also, the Board will, as is customary, look at Contingent Compensation awards at the end of the current plan year and will quite possibly take into account such things as past contributions, value & attitude during transition period, etc.—nobody can speak for or bind the Board, but transition assistance could very well be regarded by them in this way on a case-by-case basis.

IV. Finally, as you know, your 6/15 agreement is legally binding & enforceable, and if you determine you wish to receive the entire payment, Jewel recognizes its obligation to do so despite the deleterious tax problems to both parties.

The amended severance pay agreements reduced the amounts of severance pay due under the original severance agreements in an effort to avoid the imposition of the golden parachute tax.[3] Each amended severance agreement stated:

---

[3] Sec. 280G(b)(2)(A)(ii) defines a parachute payment to require that the present value of the payment equal or exceed three times the disqualified individual's base amount. The severance pay under the amended severance agreements and three times the base amount calculations are as follows:

|  | Severance pay | 3 × base amount |
|---|---|---|
| Mr. Balch | $317,500 | $320,718 |
| Mr. Howe | 793,000 | 802,776 |
| Mr. Christopherson | 1,635,000 | 1,642,518 |
| Mr. Dorsher | 449,500 | 467,904 |
| Mr. Cline | 1,210,000 | 1,216,197 |

The amounts of the severance pay under the original severance agreements are not in the record.

Jewel Companies, Inc. (the "Company") entered into an agreement with you dated June 15, 1984, under which the Company agreed to pay you certain benefits upon termination of employment. You have offered to reduce the amount payable to you under the Agreement with the intended result that no amount payable to you shall become subject to an excise tax under the so-called "golden parachute" provisions of the tax legislation which had recently been enacted by Congress, but has not yet been signed into law by the President of the United States. You have requested that termination of your employment by the Company be eliminated as a condition to your rights under the Agreement. Your proposal is acceptable to the Company.

After the acquisition of Jewel, however, American Stores, and its affiliates agreed to employ petitioner husbands and to pay them additional compensation. (Normally, when employees resigned, American Stores did not compensate them with bonuses or additional consulting arrangements.) In determining the amount of additional compensation, Mr. Bergeson considered the difference between the severance pay provided in the original severance agreements and the severance pay provided in the amended severance agreements. While each petitioner husband received a different amount of additional compensation, the amounts of additional compensation were not based on the time spent performing additional services; in fact, American Stores did not keep records of the time spent by petitioner husbands in providing the additional services. According to Mr. Bergeson, the additional compensation generally equaled the difference between each petitioner husband's severance pay under the original severance agreements and the severance pay due under the amended severance agreements. However, he believed that Mr. Howe's additional compensation was "a bit short" of the difference in his severance pay.

*Mr. Balch*

Prior to the acquisition, Mr. Balch was vice president and treasurer of Jewel. He also served informally as secretary to the board of trustees of the Jewel Co. Investment Trust.

Mr. Balch took a leave of absence on September 10, 1984, and he resigned on November 5, 1984. Pursuant to his amended severance agreement, he received $317,500 in severance pay in 1984.

After the acquisition, he served as administrative trustee for two of Jewel's benefit plans: The Jewel Cos. Retirement

Estates and the Jewel Supplementary Retirement Estates. In addition, he continued to serve informally as secretary to the Jewel Co. Investment Trust. During 1984, he spent 20 hours performing these services. According to Mr. Balch, his duties as an administrative trustee and secretary consisted of signing a few documents. He explained that he played no role in preparing the documents and that the other two trustees signed the bulk of the documents. Mr. Balch also prepared the monthly performance reports, which he admitted "most accountants could have done * * * without much trouble".

Mr. Balch provided consulting services to Jewel, including the preparation of yearend financial statements for Jewel's retirement and stock ownership plans and trusts. He spent approximately 30 workdays performing such services, almost all of them in 1985. With respect to his preparation of financial statements as a consultant, he candidly admitted that "any C.P.A. would be able to do it". He spent no time providing consulting services in 1986. In exchange for his services, American Stores paid Mr. Balch $60,000 in both 1985 and in 1986.

In the notice of deficiency, respondent determined that reasonable compensation for Mr. Balch's services would have been $15,000 for 1985 and $15,000 for 1986. To prove the reasonableness of the notice of deficiency determination, respondent posits on brief that it is reasonable to determine the amount of "reasonable compensation" for Mr. Balch's and the other petitioner husbands' post-merger consulting services by multiplying the individual's daily rate of compensation prior to the termination of his full-time employment by the number of days thereafter worked.[4] Respondent utilized a $445 daily rate for Mr. Balch; such amount was determined by dividing Mr. Balch's 1983 compensation ($115,808) by 260 working days. For 1984, respondent asserts that the reasonable amount of Mr. Balch's compensation would have been under $1,500, based on Mr. Balch's daily rate multiplied by his 20 hours of service in 1984. For 1985, respondent asserts that the reasonable amount of Mr. Balch's compensation

---

[4] Respondent used daily rate calculations with respect to Messrs. Balch, Howe, Christopherson, and Dorsher. Respondent did not move to increase the deficiencies determined in the notices of deficiency. Instead, respondent used the daily rate calculations in order to prove that the reasonable compensation for these petitioner husbands was actually less than the amount allowed by respondent in the notices of deficiency.

would have been $13,350, based on Mr. Balch's daily rate multiplied by his 30 days of service for that year. For 1986, respondent asserts that the reasonable amount of Mr. Balch's compensation would have been zero.

*Mr. Howe*

Prior to the acquisition, Mr. Howe was vice chairman of the Jewel board of directors. Mr. Howe took a leave of absence on July 12, 1984, and resigned on October 12, 1984. Pursuant to his amended severance agreement, he received $793,000 in severance pay in 1984.

After the acquisition, Mr. Howe agreed to continue to be a trustee for the Jewel Co. Investment Trust through December 1984. Apart from Mr. Howe's recollection that he spent "very little" time as trustee in 1984, there is no evidence as to the amount of time Mr. Howe spent as a trustee.

Mr. Howe also agreed to provide consulting services for the Jewel Co. Investment Trust and Jewel Co. Retirement Estates through December 1984. His consulting services consisted of a telephone conversation with Mr. Bergeson in January 1986 and a 1½-page letter written to Mr. Bergeson in March 1986 concerning the asset mix in two of Jewel's and American Stores' retirement funds.

Mr. Howe did not work exclusively for American Stores after the acquisition. He served on the boards of directors of several major companies in the Chicago area and, in January 1985, he began employment as the executive director and head of the Civic Committee for the Commercial Club of Chicago.

American Stores agreed to pay Mr. Howe $150,000 for his trustee services through December 1984 and his consulting services from January 1985 through June 1985. In addition, American Stores agreed to pay him $75,000 per year for his consulting services through 1988, unless the agreement was canceled earlier. American Stores ultimately paid Mr. Howe $187,500 in 1985 and $75,000 in 1986 for his services.

Respondent determined that reasonable compensation for Mr. Howe's services would have been $20,000 in 1985 and $20,000 in 1986. Using a daily rate of $1,300, based on Mr. Howe's 1983 compensation of $336,510 for 1984 and 1985, respondent asserts that the reasonable amount of Mr. Howe's

compensation would have been zero for each year because Mr. Howe provided little or no services from the date of acquisition in 1984 through 1985. For 1986, respondent calculates that the reasonable amount of Mr. Howe's compensation would have been $2,600, based on his working not more than 2 days during that year.

## Mr. Christopherson

Prior to the acquisition, Mr. Christopherson was chairman of the board of directors and chief executive officer of Jewel. Mr. Christopherson took a leave of absence on July 12, 1984, and resigned on October 12, 1984. Pursuant to his amended severance agreement, he received $1,635,000 in severance pay in 1984.

After the acquisition, Mr. Christopherson agreed to continue as a trustee of the Jewel Co. Investment Trust for the remainder of 1984 and to cooperate with the transition team in combining the business operations and the management of Jewel and American Stores. As trustee of the Jewel Co. Investment Trust, he attended one meeting in August 1984 and one meeting in October 1984, each meeting lasted 3 to 4 hours.

In 1985, American Stores paid Mr. Christopherson $105,000 for his trustee services. It also paid him $250,000, which it called a 1984 bonus, for his cooperation with the transition team. There was no written agreement concerning compensation for his additional services. When Mr. Christopherson received a $250,000 check from American Stores as a bonus for 1984, he was surprised because he had "not been called on to do anything". It seemed clear to Mr. Christopherson that his "lack of interference in the transitional process was serving Sam Skaggs (Chairman of the Board of Directors of American Stores) very well".

Respondent determined that reasonable compensation for Mr. Christopherson's additional services would have been $20,000 in 1985. Using a daily rate of $2,300, based on Mr. Christopherson's 1983 compensation of $600,250, respondent calculates that the reasonable amount of compensation would have been less than $2,300 for both 1984 and 1985 because Mr. Christopherson provided approximately 1 day of services in 1984 after the acquisition and no other services thereafter.

## Mr. Dorsher

Prior to the acquisition, Mr. Dorsher was vice president of human resources for Jewel. Mr. Dorsher resigned on December 31, 1984. Pursuant to his amended severance agreement, he received $449,500 in severance pay in 1984.

After the acquisition, Mr. Dorsher agreed to serve as a trustee of the Joint Employer-Union Board of Trustees of the United Food and Commercial Workers International Union and Industry Pension Fund. As a trustee, Mr. Dorsher attended meetings for a total of 24 days in 1985 and 13 days in 1986.

During 1985 and 1986, Mr. Dorsher also agreed to be available for up to 90 days per year as a consultant to American Stores regarding labor relations and benefits plans. However, Mr. Dorsher did not provide any such consultation. American Foods paid Mr. Dorsher $100,000 in both 1985 and 1986 in exchange for making himself available to provide these additional services. There was no written agreement concerning compensation for his additional services.

Respondent determined that reasonable compensation for Mr. Dorsher's additional services would have been $30,000 in 1985 and $16,500 in 1986. Using a daily rate of $650, based on Mr. Dorsher's 1983 compensation of $169,292, respondent calculates that the reasonable amount of Mr. Dorsher's compensation would have been $15,600 for 1985 because he provided 24 days of service during that year. For 1986, respondent calculates that the reasonable amount of Mr. Dorsher's compensation would have been $8,450 because he worked only 13 days during 1986.

## Mr. Cline

Prior to the acquisition, Mr. Cline was president and chief operating officer of Jewel, his annual salary was $365,000, and his target bonus for 1984 was $110,000. On July 13, 1984, after Mr. Christopherson resigned as Jewel's chairman of the board and chief executive officer, Mr. Cline became chairman and chief executive officer of Jewel and his annual salary was increased to $475,000 to compensate him for his additional duties as a result of the acquisition. Mr. Cline received $474,881 as his total salary and bonus for 1984.

Pursuant to his amended severance agreement, he received $1,210,000 in severance pay in 1984.

In October 1984, Mr. Skaggs asked Mr. Cline to remain with Jewel until the end of January 1985. Mr. Cline responded by reminding Mr. Skaggs about American Stores' promise to try to find an opportunity for him to earn additional compensation, and he asked Mr. Skaggs if he would qualify for a bonus. Mr. Skaggs replied that he would check with his tax counsel.

Mr. Cline knew that his employment with Jewel was temporary. Starting in November 1984, with the knowledge of officials at American Foods, Mr. Cline began traveling, seeking new employment with other supermarket retailing companies.

Mr. Cline resigned, effective February 3, 1985. As compensation for his services from January 1, 1985, through February 2, 1985, he received $409,163, consisting of a $300,000 bonus in addition to $109,163 that was attributable to his $475,000 annual salary, his unused vacation pay, and other miscellaneous items.

Respondent determined that reasonable compensation for Mr. Cline in 1985 would have been $109,163 and that none of his $300,000 bonus would have constituted reasonable compensation.

## ULTIMATE FINDINGS OF FACT

1. The additional compensation received by petitioner husbands was contingent on a change in control under section 280G(b)(2)(A)(i).

2. The payments petitioner husbands received from Jewel and/or American Stores as additional compensation for consulting services and/or a bonus constitute "excess parachute payments" within the purview of sections 280G and 4999.

3. Except as determined by respondent, none of the amounts paid to petitioner husbands as compensation for the rendering of additional personal services (consulting or otherwise) was reasonable under section 280G(b)(4)(A).

4. The bonuses paid to Messrs. Cline and Christopherson (for 1984) were in reality compensation for the reduction in their severance pay. No portion of the bonuses paid to

Messrs. Cline and Christopherson constitutes reasonable compensation.

## OPINION

Section 4999(a) imposes a 20-percent excise tax on excess parachute payments.[5] Under section 280G(b)(2), a parachute payment is a payment in the nature of compensation to a disqualified individual,[6] if the payment is "contingent on a change" in the ownership or control of the corporation and the present value of the payment equals or exceeds three times the individual's base amount.[7] However, under section 280G(b)(4)(A), the amount treated as a parachute payment shall not include the portion of such payment which the taxpayer establishes by clear and convincing evidence is

---

[5] Sec. 280G(b) defines an excess parachute payment as follows:

SEC. 280G(b). EXCESS PARACHUTE PAYMENT.—For purposes of this section—

(1) IN GENERAL.—The term "excess parachute payment" means an amount equal to the excess of any parachute payment over the portion of the base amount allocated to such payment.

(2) PARACHUTE PAYMENT DEFINED.—

(A) IN GENERAL.—The term "parachute payment" means any payment in the nature of compensation to (or for the benefit of) a disqualified individual if—

(i) such payment is contingent on a change—

(I) in the ownership or effective control of the corporation, or

(II) in the ownership of a substantial portion of the assets of the corporation, and

(ii) the aggregate present value of the payments in the nature of compensation to (or for the benefit of) such individual which are contingent on such change equals or exceeds an amount equal to 3 times the base amount.

[6] Sec. 280G(c) defines disqualified individuals as follows:

SEC. 280G(c). DISQUALIFIED INDIVIDUALS.—For purposes of this section, the term "disqualified individual" means any individual who is—

(1) an employee, independent contractor, or other person specified in regulations by the Secretary who performs personal services for any corporation, and

(2) is an officer, shareholder, or highly-compensated individual.

[7] Sec. 280G defines base amount as follows:

SEC. 280G(b). EXCESS PARACHUTE PAYMENT.—For purposes of this section—

*     *     *     *     *     *     *

(3) BASE AMOUNT—

(A) IN GENERAL.—The term "base amount" means the individual's annualized includible compensation for the base period.

(B) ALLOCATION.—The portion of the base amount allocated to any parachute payment shall be an amount which bears the same ratio to the base amount as—

(i) the present value of such payment, bears to

(ii) the aggregate present value of all such payments.

*     *     *     *     *     *     *

(d) OTHER DEFINITIONS AND SPECIAL RULES.—For purposes of this section—

*     *     *     *     *     *     *

(2) BASE PERIOD.—The term "base period" means the period consisting of the most recent 5 taxable years ending before the date on which the change in ownership or control described in paragraph (2)(A) of subsection (b) occurs (or such portion of such period during which the disqualified individual was an employee of the corporation).

"reasonable compensation" for personal services to be rendered on or after the date of the change in ownership and control.

*Petitioners' Additional Compensation Was Contingent on a Change in Control Under Section 280G(b)(2)(A)(i)*

The first issue we address is whether the additional compensation received by petitioner husbands was contingent on a change in control of Jewel under section 280G(b)(2)(A)(i). We conclude that it was.

Section 280G does not define the term "contingent on a change in control". The conference report for the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, states that generally a payment is contingent on a change in control if such payment would not in fact have been made had no change in control occurred:

> To be a parachute payment, the payment must be contingent on a change in ownership or effective control. In general a payment is to be treated as contingent on a change of ownership or control under the provision if such payment would not in fact have been made to the disqualified individual had no change in ownership or control occurred. * * *
>
>     \*    \*    \*    \*    \*    \*    \*
>
> Whether a particular transaction involves a change in the ownership or effective control of a corporation or in the ownership of a substantial portion of its assets is to be determined under all the facts and circumstances.
> [H. Conf. Rept. 98-861 (1984), 1984-3 C.B. (Vol. 2) 1, 105.]

Preliminary to our consideration of whether the payments were contingent on a change in control, we find that Jewel, American Stores, and petitioner husbands made two different agreements in exchange for petitioner husbands' execution of the amended severance pay agreements. First, under the written amended severance agreements, there was an agreement whereby petitioner husbands agreed to accept a reduction in their severance pay, and second, under the oral additional compensation agreement, there was an agreement whereby American Stores became obligated to use its best efforts to employ petitioner husbands in order to compensate them for the reduction in their severance pay that resulted from the amendment of the original severance agreements.

We base our finding that American Stores agreed to use its best efforts to employ petitioner husbands in order to com-

pensate them for the reduction in their severance pay on the undisputed testimony of Messrs. Berrey and Bergeson and on Mr. Sunday's notes. Mr. Berrey testified that American Stores intended to compensate petitioner husbands for the reduction in severance pay under the amended severance agreements. Mr. Bergeson testified that he told petitioner husbands that American Stores intended to use its best efforts to compensate them for the reduction in severance pay under the amended severance agreements. And, according to his notes, Mr. Sunday told petitioner husbands that American Stores would consider their efforts to make the post-acquisition transition as smooth as possible.

In finding that American Stores' payment of petitioner husbands' additional compensation was contingent on the change in control of Jewel within the meaning of section 280G(b)(2)(A)(i), we are mindful that the payment of additional compensation was also contingent on American Stores' success in using its best efforts to employ petitioner husbands. However, the existence of this additional contingency does not change our finding that the additional compensation received by petitioner husbands was contingent on a change in control of Jewel. Similarly, we find that, under all the facts and circumstances, petitioner husbands would not have received their additional compensation had there been no change in control of Jewel.

As an aside, we note our concern that other similarly situated disqualified individuals (each petitioner husband was a disqualified individual under section 280G(c)) might attempt to avoid taxation under section 4999 by restructuring the timing and characterization of parachute payments in the future. Applying petitioners' reasoning, any disqualified individual could avoid taxation of his parachute payment by utilizing such a strategy. For example, a disqualified individual might seek to reduce his severance pay to an amount less than three times his base amount in exchange for the acquiring company's promise to use its best efforts to employ and compensate him after the change in control. Then, after the change in control, to make up for the reduction in his severance pay, the acquiring company could employ the individual for an amount in excess of reasonable compensation, thereby avoiding the adverse tax consequences of sections 280G and 4999.

Petitioners claim that American Stores' payment of additional compensation to petitioner husbands was not contingent on the change in control of Jewel. While acknowledging that American Stores amended the original severance agreements to avoid losing a deduction for those payments to petitioner husbands deemed to constitute an "excess parachute payment", petitioners argue that the original severance agreements were amended so that American Stores could retain the services of petitioner husbands during the transition period. Petitioners explain that American Stores was concerned that the original severance pay was "triggered" upon termination of petitioner husbands' employment with Jewel and the original severance agreements contained no restrictions on petitioner husbands' right to terminate their employment. Petitioners assert that the amended severance agreements addressed this problem by eliminating the termination "trigger", thereby reducing the incentive for petitioner husbands to immediately terminate their employment. Petitioners further assert that American Stores wanted each of petitioner husbands to render services after the change in control because each had important experience and could contribute to the successful integration of Jewel and American Stores. Such, however, could have been accomplished by American Stores' rehiring petitioner husbands.

Petitioners protest respondent's assertion that petitioner husbands did not execute the amended severance agreements in exchange for any promise by American Stores. Petitioners assert that petitioner husbands rejected American Stores' offer to use its best efforts to employ them and to compensate them for the reduction in their severance pay. Petitioners, however, failed to establish that such a rejection was effected by petitioner husbands. Indeed, petitioner husbands' conduct confirms the existence of the oral agreement: in fact, American Stores eventually did offer them employment; they accepted the offer and were compensated for the reduction in their severance pay.

Petitioners assert that the amended severance agreements were executed in exchange for petitioner husbands' right to obtain severance pay immediately after the change in control without terminating petitioner husbands' employment. Our finding that petitioner husbands accepted American Stores' offer to use its best efforts to employ them and compensate

them for the reduction in severance pay is not inconsistent with petitioners' assertion that petitioner husbands may have had this additional reason for amending the severance agreements.

Petitioners alternatively argue that even if the additional compensation was paid pursuant to an oral agreement entered into before the change in control, any such agreement was not a "legally enforceable agreement" within the meaning of the proposed regulations, which state as follows:

Q-23: May a payment be treated as contingent on a change in ownership or control if the payment is made under an agreement entered into after the change?

A-23: (a) *No. Payments are not treated as contingent on a change in ownership or control if they are made (or to be made) pursuant to an agreement entered into after the change.* For this purpose, *an agreement that is executed after a change in ownership or control, pursuant to a legally enforceable agreement that was entered into before the change, will be considered to have been entered into before the change.* * * *

(b) The following examples illustrate the principles of this A-23:

*Example (1).* Assume that a disqualified individual is an employee of a corporation. A change in control of the corporation occurs, and thereafter the individual enters into an employment agreement with the acquiring company. Since the agreement is entered into after the change in control occurs, payments to be made under agreement are not treated as contingent on the change.

*Example (2).* Assume the same facts as in example (1), except that the agreement between the disqualified individual and the acquiring company is executed after the change in control, pursuant to a legally enforceable agreement entered into before the change. Payments to be made under the agreement may be treated as contingent on the change in control pursuant to Q/A-22 of this section. * * *

[Sec. 1.280G-1, Q&A-22, Proposed Income Tax Regs., 54 Fed. Reg. 19399 (May 5, 1989); emphasis added.]

## The General Explanation of the Deficit Reduction Act of 1984 provides:

To be a parachute payment, a payment must be contingent on a change in ownership or control. In general, a payment is to be treated as contingent on a change in ownership or control if such payment would not in fact have been made had no change in ownership or control occurred. A payment generally is to be treated as one which would not have in fact been made unless it is substantially certain, at the time of the change, that the payment would have been made whether or not the change occurred. * * *

\* \* \* \* \* \* \*

The following examples illustrate the "contingent on a change in ownership or control" concept.

\* \* \* \* \* \* \*

*Example (3).*—Assume that a disqualified individual is a common law employee of a corporation. A change in control of the corporation occurs, and, *pursuant to a formal or informal understanding reached before the change occurs, the individual enters into an employment agreement, consulting agreement, agreement not to compete, or similar arrangement with the acquiring company* for a term of 3 years. *An amount equal to the value,* generally determined as of the date the contract becomes operative, *of payments to be made under such an agreement is to be treated as contingent on the change in control.*

[Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 201-202 (J. Comm. Print 1984); emphasis added.]

Citing Illinois law, petitioners assert that any such oral agreement would not be enforceable because "under the parol evidence rule \* \* \* evidence of prior or contemporaneous oral agreements is not admissible to vary or contradict the terms of a writing, otherwise unambiguous on its face." *Land of Lincoln Sav. & Loan v. Michigan Ave. Natl. Bank,* 432 N.E.2d 378, 383 (Ill. App. Ct. 1982). Petitioners also note that the amended severance agreements each contained the following integration clauses:

2. *Effect on Other Plans, Agreements and Benefits.* \* \* \* The terms of this Agreement shall supersede any existing agreement between you and the Company executed prior to the date hereof to the extent any such agreement is inconsistent with the terms hereof.

6. *Miscellaneous.* \* \* \* No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not expressly set forth in this Agreement.

Petitioners' alternative argument is flawed. Aside from the original severance agreements, petitioner husbands were parties to two different agreements: First, the amended severance agreements, under which Jewel agreed to pay petitioner husbands a reduced severance pay; and second, the separate oral agreement, under which American Stores agreed to use its best efforts to employ petitioner husbands and thereby compensate them for the reduction in their severance pay. Contrary to petitioners' assertion, evidence of American Stores' oral agreement is not inadmissible under the parol

evidence rule because the terms of the oral agreement do not vary or contradict the terms of the amended severance agreements and are not within the scope of the amended severance agreements.[8]

The existence of the integration clauses in the amended severance agreements does not change our analysis because American Stores' oral agreement concerned a different subject matter: The oral agreement concerned American Stores' obligation to use its best efforts to employ petitioner husbands; whereas, the written amended severance agreements concerned Jewel's obligation to make severance payments to petitioner husbands.[9]

*Petitioners' Additional Compensation Was Not Reasonable Compensation for the Services They Rendered After the Change in Control Under Section 280G(b)(4)(A)*

The next issue we address is whether the amount of petitioner husbands' additional compensation was reasonable. Under section 280G(b)(4)(A), the amount treated as a parachute payment does not include the portion of such payment which the taxpayer establishes by clear and convincing evidence is "reasonable compensation" for personal services to be rendered after the date of the change in ownership and control. As emphasized by the conference committee, "it is presumed that no parachute payment is reasonable compensation for personal services actually rendered. Such presumption may be rebutted, but only by clear and convincing evidence." H. Conf. Rept. 98-861 (1984), 1984-3 C.B. (Vol. 2) 1, 106. The conference committee members stated:

---

[8] The parol evidence rule is defined in 2 Restatement, Contracts 2d, sec. 213 (1981), as follows:

(1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.
(2) A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

[9] Respondent does not argue, and we do not address, the argument that the parol evidence rule is binding upon only those persons who are parties to the document. Compare *Smith v. Commissioner*, T.C. Memo. 1962-294, affd. 331 F.2d 298 (7th Cir. 1964) ("We, however, have admitted such extrinsic evidence to establish a prior or contemporaneous oral agreement as to the allocation of profits. That such evidence was admissible for this purpose is well established as a matter of law.") with 9 Wigmore, Evidence in Trials at Common Law, sec. 2446, at 156 (Chadbourn rev. 1981) ("the [parol evidence] rule will still apply to exclude extrinsic utterance, even as against other parties, provided it is sought to use those utterances for the very purpose for which the writing has superseded them as the legal act").

The conferees believe that in most large corporations, executives are not under-compensated. As a result, the conferees contemplate that only in rare cases, if any, will any portion of a parachute payment be treated as reasonable compensation in response to an argument that the executive was under-compensated in earlier years. [*Id.*]

In the General Explanation of the Deficit Reduction Act of 1984, the staff of the Joint Committee on Taxation included three factors in determining whether compensation is reasonable:

In the case of an employment contract, whether payments under it would be deemed reasonable would depend on all the facts and circumstances, including the individual's historic compensation, the duties to be performed under the contract, and the compensation of individuals of comparable skills outside of an acquisition context. [Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 204 (J. Comm. Print 1984)].

With respect to each petitioner husband except Mr. Cline, respondent calculated the reasonable amounts of his compensation by multiplying the number of days worked by his daily rate. Respondent based the daily rates on the annual compensation each petitioner husband received from Jewel for 1983. Respondent then used the daily rate calculations in order to establish that reasonable compensation for each would have been less than the amount allowed by respondent in the notices of deficiency.

Petitioners have failed to prove by clear and convincing evidence that the amounts of petitioner husbands' additional compensation (beyond the amounts determined by respondent) were reasonable under any of the three factors set forth in the General Explanation. Mr. Bergeson admitted at trial that, in determining the amounts of additional compensation, he did not consider comparable compensation paid other individuals for similar services and that he did not base the amounts of additional compensation on the time petitioner husbands spent performing additional services. He also agreed that normally when employees resigned, American Stores did not compensate them with bonuses or additional consulting arrangements.

The factors set forth in the General Explanation support respondent's use of daily rates. First, the daily rates of compensation calculated by respondent from each petitioner husband's annual compensation in 1983 depend, by definition,

on his historic compensation. Second, the daily rates, ranging from $445 for Mr. Balch to $2,300 for Mr. Christopherson, were consistent with the compensation of individuals of comparable skills outside of an acquisition context. Respondent introduced the testimony of Walter Blake, an employee of Kroger Co. (a company in a business similar to that of Jewel and American Stores). Mr. Blake explained that Kroger Co. occasionally hired ex-employees as consultants. He then explained that Kroger Co. would compensate them based on a daily rate of compensation, which was calculated by dividing their prior annual compensation with Kroger Co. by the number of working days.

Petitioners object that respondent's use of daily rates was too simplistic and mechanical. They argue that the Tax Court has rejected the use of daily rates of compensation in calculating reasonable compensation under section 162 and should so similarily reject it here.[10] *Suwannee Lumber Manufacturing Co. v. Commissioner,* T.C. Memo. 1979-477.

Our opinion in *Suwannee Lumber* does not support petitioners' contention. We rejected the Commissioner's use of a daily rate in that case, reasoning that the daily rate did not accurately reflect the value of the services rendered. However, we concluded that the salary payments were reasonable based on the taxpayer's evidence concerning comparable pay in similar businesses. In the instant case, however, the evidence of comparable compensation was consistent with respondent's use of daily rates. Accordingly, we hold that respondent's use of daily rates in this case was proper.

Petitioners persist in arguing that respondent's calculations, based on daily rates, were incomplete. In support of their argument, petitioners explain that petitioner husbands' continued affiliation with Jewel and American Stores, apart from the number of days petitioner husbands actually worked, had value to Jewel and American Stores in allaying other Jewel employees' fears about the acquisition. *Dave Fischbein Manufacturing Co. v. Commissioner,* 59 T.C. 338, 345 (1972) ("The employees, many of whom had been with Dave for 20 years or more, had strong personal feelings and

---

[10] Sec. 162(a)(1) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—(1) a reasonable allowance for salaries or other compensation for personal services actually rendered".

respect for Dave; and his mere presence increased this respect and bolstered their morale.").

Petitioners' argument, while valid in some respects, does not overcome the conference committee's statement that it is presumed that no parachute payment is reasonable compensation. Petitioners failed to rebut this presumption by clear and convincing evidence. Petitioners presented no evidence to support their argument that the reasonable amount of petitioner husbands' compensation should be greater than the amount of their historic compensation because their continued presence had additional value.

Petitioners state that "Even if petitioners' contribution to the acquisition resulted from their 'failure to disrupt or create problems for the takeover,' such contribution in and of itself would support a determination of reasonable compensation." However, such contribution is precisely the type of arrangement Congress intended to discourage with the golden parachute legislation:

> In recent years, there has been a large volume of activity involving acquisitions and attempted acquisitions of corporations by other taxpayers. In many instances, the "target" corporation has resisted being taken over. In other cases, acquisitions have gone forward on a "friendly" basis. In both situations, however, arrangements were often made to provide substantial payments to top executives and other key personnel of the target corporation in connection with any acquisition that might occur.

> \* \* \* \* \* \* \*

> In other [friendly takeover] situations, the Congress was concerned that the existence of such arrangements tended to encourage the executives and other key personnel involved to favor a proposed takeover that might not be in the best interests of the shareholders or others. This could happen if such personnel knew they would be handsomely rewarded if an acquisition took place. It could happen whether the arrangements were between such personnel and the target corporation, between such personnel and the acquiring company, or between such personnel and any other person interested in the takeover. To the extent such arrangements might have had that effect, Congress determined that they similarly should be strongly discouraged.

> In almost any takeover situation, be it hostile or friendly, the acquiring company in theory will pay a maximum amount and no more. To the extent some of that amount, directly or indirectly, must be paid to executives and other key personnel of the target corporation, because of the existence of golden parachutes or similar arrangements, there is less for the shareholders of that corporation. Congress decided to discourage trans-

actions which tended to reduce amounts which might otherwise be paid to target corporation shareholders.

[Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 199-200 (J. Comm. Print 1984).]

In other words, a disqualified individual's decision concerning whether "to disrupt or create problems for the takeover" should be based on the best interests of the shareholders, without regard to the amount of his parachute payments.

Since we conclude that petitioners failed to prove by clear and convincing evidence that the amounts of petitioner husbands' additional compensation were reasonable under section 280G(b)(4)(A), we sustain the deficiencies determined in the notices of deficiency.

*Decisions will be entered for respondent.*