Michael **SZOMJASSY**, Plaintiff,

v.

**OHM CORPORATION and International Technology Corporation, Defendants.**

No. CIV.A.1:98CV3705CAP.

United States District Court, N.D. Georgia, Atlanta Division.

March 8, 2001.

---

**1044**

Bruce Harvey Beerman, Burr & Forman, John Allen Howard, Marion Smith, II, Smith Howard & Ajax, Atlanta, GA, for Plaintiff.

William Sneath Myers, Myers & Johnston, Atlanta, GA, for Defendants.

### ORDER

PANNELL, District Judge.

The plaintiff filed the instant action, alleging breach of contract. This matter is before the court on the parties' cross-motions for partial summary judgment.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

In analyzing a summary judgment motion, the court resolves all issues of fact in favor of the non-movant. *See Cottrell v. Caldwell,* 85 F.3d 1480 (11th Cir.1996). Therefore, the facts, as stated below, may not prove to be the facts that would be established at trial. *See Hartsfield v. Lemacks,* 50 F.3d 950, 951 (11th Cir.1995) (citing *Rodgers v. Horsley,* 39 F.3d 308, 309 (11th Cir.1994)).

The plaintiff, a Georgia citizen during the relevant time at issue,[1] was employed by the defendant OHM Corporation ("OHM") in November of 1989. Initially employed as Vice President in charge of the Southeastern Region, he was later pro-

moted to Vice President of the Southern Region, and in 1995, was promoted to Senior Vice President in charge of Eastern Operations. On May 14, 1992, the plaintiff executed his first employment contract with OHM, and on March 10, 1996, executed the Employment Agreement that is the subject of the instant litigation (the "Employment Agreement").

In late 1997, the defendants, OHM and International Technology Corporation ("IT"), began merger discussions through which IT would acquire OHM. As part of those discussions, OHM retained an accounting firm, Ernst & Young ("E & Y"), to analyze the approximate amounts that would be due to OHM executives, if the merger occurred. That analysis was provided to IT as part of the merger negotiations.

After the first stage of the merger was completed in February, 1998, the plaintiff was unwilling to accept any of the employment positions offered to him by IT. On March 3, 1998, the plaintiff was fired, along with other senior OHM executives—Robert Blackwell, Philip Petrocelli, Pamela Beall, and James Kirk. These other executives have also filed suit against the defendants, based upon their employment agreements.

The plaintiff was not paid within five (5) days of his termination, as required by the Employment Agreement, but rather was paid an advance payment of $600,000 in April, 1998. This payment was less than the lowest calculation that E & Y had approximated as the amount due to the plaintiff.

Following this payment, the plaintiff alleges that the defendants continued to acknowledge the plaintiff's entitlement to an additional contract payment, but failed to make that payment. In October, 1998, the plaintiff accepted a position with Aqua Alliance, Inc. ("AAI"). Similar to the defen-

---

1. The court notes that the pleadings indicate that the plaintiff has relocated to Massachusetts.

dants, AAI and one of its wholly-owned subsidiaries, Metcalf & Eddy ("M & E"), are in the environmental business. The business of those companies, however, differs from OHM's business operations. OHM was a construction contract firm involved in the treatment of hazardous waste. Alternatively, AAI and M & E serve as engineering, consulting and systems operations firms for water and wastewater treatment. The plaintiff contends that other than one designated representative of the defendants who testified pursuant to Fed.R.Civ.P. 30(b)(6), all other witnesses in this case have testified that neither AAI nor M & E were competitors of OHM nor are they or any representative of the defendants aware of any specific conduct or action on the part of the plaintiff in violation of the terms of the restrictive covenant contained in the Employment Agreement.

According to the plaintiff, under the terms of the Employment Agreement, OHM agreed that if it terminated the plaintiff's employment following a "change in control" of OHM, then it would financially compensate him according to the criteria set forth in the Employment Agreement, subject to certain tax considerations. The Employment Agreement provision at issue states that after termination the plaintiff will receive within five (5) business days a lump sum payment in lieu of salary, bonus, and all other incentives and compensation that he would have received during the "Period of the Employment Agreement." The dispute centers around a payment ceiling clause contained in Paragraph 5(a)(i) of the Employment Agreement, which the defendants contend limits the total amount of any termination payment to avoid triggering "parachute payment" taxes and penalties under 26 U.S.C. § 280G(b)(2)(c) & (b)(3-4). That section penalizes both parties if the termination payment due to a "change in control" exceeds 299 percent of the employee's average annual compensation over the preceding five (5) years.

The plaintiff contends that all or at least part of his termination payment compensates him for the restrictive covenant, which he argues is excluded from treatment as a "parachute payment" under Section 280G. Conversely, the defendants argue that the termination payment compensates the plaintiff only for termination of his employment before the expiration of the contract "Period," and is not made in exchange for the covenant not to compete. Alternatively, the defendants counter that even if part of the payment were attributable to the covenant not to compete, it would still constitute a parachute payment under Section 280G, which is impermissible under the Employment Agreement.

The plaintiff has moved for summary judgment on the following issues:

1. The defendants' Third Defense, as contained, in their Answer (the plaintiff's subsequent employment violated the terms of the restrictive covenant in Section 7 of the Employment Agreement);

2. The plaintiff's entitlement to payment of his reasonable attorney's fees and to replenishment of the letter of credit in accordance with Section 8 of the Employment Agreement; and

3. The defendants' counterclaim for forfeiture of the plaintiff's benefits paid under the SERP plan and for attorney's fees.

The defendants have moved for summary judgment on the following issues:

1. Count I of the Complaint in which the plaintiff claims that he is entitled to a payment attributable to a covenant not to compete in his employment agreement and his contention that such payment does not constitute a "parachute payment" within the meaning of Section 280G;

2. Count II of the Complaint in which the plaintiff seeks benefits under a deferred compensation plan; and

3. Count IV of the Complaint in which the plaintiff seeks damages for emotional distress and litigation expenses under O.C.G.A. § 13–6–11.

The parties vigorously dispute numerous factual assertions made by each other. The court addresses each of the above issues in turn.

## II. LEGAL DISCUSSION

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *see also Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir.1984). The moving party's burden is discharged merely by " 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *See Bradbury v. Wainwright*, 718 F.2d 1538, 1543 (11th Cir.1983). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In deciding a motion for summary judgment, it is not the court's function to decide genuine issues of material fact but to decide only whether there is such an issue to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The applicable substantive law will identify those facts that are material. Facts that in good faith are disputed, but which do not resolve or affect the outcome of the case, will not preclude the entry of summary judgment as those facts are not material. *See Anderson*, 477 U.S. at 247, 106 S.Ct. at 2510.

Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the non-movant. *See id.* In order for factual issues to be "genuine" they must have a real basis in the record. *See Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. "When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Id.* (citations omitted).

### B. *Choice of Law*

As an initial matter, the court turns to the disputed issue of which state's laws govern the contract. Relying on *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the plaintiff submits that because he is and was at all times a resident of Georgia, and because the contract was executed and performed in Georgia, the court should apply Georgia law. The defendants counter that the Employment Agreement's choice of law provision controls and, thus, Delaware law is applicable.

 Generally, sitting in diversity, this court applies Georgia's choice of law provisions, as embodied in the traditional rules of lex loci contractus and lex loci delecti. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *and see Lloyd v. Prudential Securities, Inc.*, 211 Ga.App. 247, 248, 438 S.E.2d 703, 704 (1993); *see also Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir.1998).

Although " 'parties by contract may stipulate that the laws of another jurisdiction will govern the transaction,' *Manderson & Associates, Inc. v. Gore,* 193 Ga.App. 723, 389 S.E.2d 251, 254 (1989)," if "the law is contrary to Georgia public policy, or the chosen jurisdiction has no substantial relationship to the parties or the transaction," Georgia courts will not apply another state's laws. *Rayle Tech, Inc.,* 133 F.3d at 1409 (citing *Velten v. Regis B. Lippert, Intercat, Inc.,* 985 F.2d 1515, 1519 (11th Cir.1993)). Similarly, Delaware courts, like Georgia courts, generally honor choice of law provisions, but they still require some material connection between the chosen jurisdiction, parties, and purpose of the contract. *See Wilmington Trust Co. v. Wilmington Trust Co.,* 26 Del.Ch. 397, 24 A.2d 309, 313 (1942); *compare A.I.C., Ltd. v. Mapco Petroleum, Inc.,* 711 F.Supp. 1230, 1237 (D.Del.), aff'd. mem., 888 F.2d 1378 (3d Cir.1989) (upholding similar choice of law provision when defendant was incorporated in Delaware).

■ Section 13 of the Employment Agreement unambiguously provides a choice of law provision, stating that the "validity, interpretation, construction, and performance of this Agreement shall be governed by the laws of the State of Delaware, without giving effect to the principles of conflict of laws of such State." Employment Agreement Attachment to Plaintiff's Motion for Partial Summary Judgment [Doc. No. 33–1]. There has been no showing and, the court finds that application of Delaware law to the instant dispute would not contravene Georgia public policy. The court, however, finds that Delaware has no substantial relationship, if any, to the parties in this case. The plaintiff is a Georgia citizen. Although it does some business in Georgia, OHM is a corporation organized and existing under the laws of Ohio. IT's headquarters and principal place of business is in Pennsylvania. The defendants have failed to provide any basis for choosing Delaware law. *See* Defendants' Brief In Opposition to Plaintiff's Motion for Partial Summary Judgment at 9–10 [Doc. No. 39–1]. Accordingly, the court holds that Georgia law governs the contractual rights and duties of the parties.

## C. *Plaintiff's Motion for Partial Summary Judgment*

### 1. *Violation of Restrictive Covenant*

#### a. *Plaintiff's Subsequent Employment & Defendants' Third Defense*

■ The plaintiff submits that: (1) there is insufficient record evidence to establish that he violated the non-competition provisions of the restrictive covenant during its applicable period; (2) the defendant's prior breach of the Employment Agreement excuses any alleged breach; and (3) Georgia public policy prevents the defendants from disqualifying him from receiving further benefits based upon the restrictive covenant. Conversely, the defendants submit that a reasonable fact finder could infer that the plaintiff violated the terms of one of his covenants not to compete and thereby excused the defendants' alleged breach.

The plaintiff contends that there is no evidence that he engaged in competitive activity as defined by Section 7 of the Employment Agreement, which provides:

> During a period following the later of the expiration of the Period of Employment or the period ending one year after the Termination date, if the executive shall have received or shall be receiving benefits ... shall not ... engage in any Competitive Activity ... directly or indirectly ... in any business activity in competition with any business activity of the Company ....

The plaintiff argues that other than one person, all of the witnesses have testified that the plaintiff's subsequent employers, AAI and M & E, were not OHM's competitors. The plaintiff, however, has made no showing as to why that lone unfavorable witness should not be considered relevant or material to the question of competitive

activity. Further, the defendants counter that the record evidence shows a substantial number of specific projects on which both the defendants and M & E competed. They also argue that Philip Strawbridge, an OHM executive, believed that M & E was a competitor of IT. While there is a paucity of evidence demonstrating that the plaintiff was a competitor within the meaning of Section 7, there is some evidence that he engaged in competitive activity.

In general the parties' disparate factual assertions would prevent the court from ruling on summary judgment as to this issue. Because, however, the court finds that the restrictive covenant is invalid, the plaintiff is entitled to summary judgment as to the defendants' third defense.

### b. *Restrictive Covenant*

The plaintiff contends that the contract language and the defendants' conduct limit the restrictive covenant to one year. Alternatively, the plaintiff points to an estoppel argument and then Georgia public policy as grounds for not enforcing the restrictive covenant beyond one year. The defendants counter that the plain meaning of the Employment Agreement demonstrates that the period of the restrictive covenant was the three year "Period of Employment" and not the one year following the "Termination" date. *See* Employment Agreement Attachment to Plaintiff's Motion for Partial Summary Judgment [Doc. No. 33–1].

Section 2(b) defines the time frame of the "Period of Employment" term in Section 7 as commencing:

> on the date of an occurrence of a Change in Control, and subject only to the provisions of Section 4 hereof, shall continue until the earlier of (i) the expiration of the third anniversary of the occurrence of the Change in Control, (ii) the Executive's death, or (iii) the Executive's attainment of age 65; provided, however, that commencing on each anniversary of the Change of Control, the Period of Employment shall automatically be extended for an additional year

unless ... the Company or the Executive shall have given written notice to the other that the Term shall not be so extended.

*Id.* at 3. There is no record evidence that either party gave notice that the term was not being renewed. The plaintiff entered the Employment Agreement on March 10, 1996, and was fired on March 3, 1998.

With respect to the terms and operation of the Employment Agreement, the plaintiff argues that the defendants fail to recognize that the "Period of Employment" is explicitly subject to the contract's provisions of Section 4, which provides:

> 4. *Termination Following a Change in Control:*
>
> . . . . .
>
> (b) In the event of the occurrence of a Change in Control, this Agreement may be terminated by the Executive during the Period of Employment, and the Executive shall be entitled to have the right to benefits as provided in Section 5 hereof, upon the occurrence of one or more of the following events:
>
> > (i) Any termination by the Company of the employment of the Executive prior to the date upon which the Executive shall have attained age 65, which termination shall be for any reason other than for Cause ...

*Id.* The plaintiff points out that if the "Period of Employment," irrespective of other termination events and clauses contained in the Employment Agreement, was to have been three years, then Section 2(b)'s limitation of the period by Section 4 would be meaningless. Moreover, they argue that such an interpretation is contradicted by the drafting attorneys of the Employment Agreement. Furthermore, contrary to the defendants' assertions, the plaintiff contends that his entitlement to recover benefits under Section 5 is not "directly linked" to the period of the restrictive covenant, because its value is determined independently of the length of

the restrictive covenant. The court agrees. Giving force to the explicit language of the contract yields a one year restrictive covenant following the plaintiff's termination on March 3, 1998. Thus, the restrictive covenant would have ended on March 3, 1999.

Even assuming that the defendants' interpretation of the Employment Agreement is correct, the plaintiff still succeeds on his argument, because the court, below, finds that the restrictive covenant is invalid.

### c. *Invalidity of Restrictive Covenant*

Under Georgia law, the court would still refuse to enforce the covenant, because it finds it "particularly distasteful" to do so. *Nordson Corp. v. Plasschaert*, 674 F.2d 1371, 1376 (11th Cir.1982) (citing *Commercial Credit Plan, Inc. v. Parker*, 152 Ga. App. 409, 263 S.E.2d 220 (1979)). Georgia courts have traditionally applied close scrutiny to employment contracts containing restrictive covenants and have upheld them only when the covenant is strictly limited in time, territorial effect, and activities prohibited. *See Beckman v. Cox Broadcasting Corp.*, 250 Ga. 127, 129, 296 S.E.2d 566 (1982); *and see generally Ceramic & Metal Coatings, Corp. v. Hizer*, 242 Ga.App. 391, 529 S.E.2d 160 (2000); *and see W.R.Grace & Co. v. Mouyal*, 262 Ga. 464, 465(1), 422 S.E.2d 529 (1992) (holding that in making its determination the court looks to the duration, territorial coverage, and scope of activity). In reaching its decision, the court also considers the relationship between the parties and their relative bargaining power. *See generally Watson v. Waffle House, Inc.*, 253 Ga. 671, 324 S.E.2d 175 (1985) (considering the relative bargaining power of the parties in deciding whether a lease agreement was more like a sale of a business or an employment agreement); *and see Carroll v. Ralston & Associates, P.C.*, 224 Ga.App. 862, 481 S.E.2d 900 (1997).

Having reviewed its terms, the court finds that the covenant is overbroad in terms of its territorial coverage. Although in Georgia the court will accept as prima facie valid a covenant which restricts the employee from doing business in the territory in which he was employed, the court "will not accept as prima facie valid a covenant related to the territory where the employer does business where the only justification is that the employer wants to avoid competition by the employee in that area." *Rollins Protective Svcs. Co. v. Palermo*, 249 Ga. 138, 140, 287 S.E.2d 546 (1982) (punctuation omitted). Moreover,

> the prohibition against post-employment solicitation of any customer of the employer located in a specific geographic area is an unreasonable and overbroad attempt to protect the employer's interest in preventing the employee from exploiting the personal relationship the employee has enjoyed with the employer's customers.

*W.R.Grace & Co.*, 262 Ga. at 466–67, 422 S.E.2d 529.

Under the defendants' analysis, the term "Company" includes not only OHM, but IT, and any other successors in interest to the Employment Agreement. *See* Defendants' Brief in Opposition to the Plaintiff's Motion for Partial Summary Judgment at 7 [Doc. No. 39–1]. Hence, the defendants contend that the plaintiff is not permitted to work for or with any business that he had any contact with while employed with OHM that is in competition with OHM and IT, their affiliates and subsidiaries, or any other successor in interest to the Employment Agreement without any geographical limitations. In fact shortly after the plaintiff accepted employment with AAI, the defendant IT contacted AAI and informed it that the plaintiff had "entered into contracts with OHM Corporation, which has now merged with IT which prohibits his employment in any capacity with your firm." Plaintiff's Motion for Partial Summary Judgment at 22 [Doc. No. 33–1] (citations omitted). The covenant goes too far.

Moreover, because the restrictive covenant contemplates any territory added during the "Period of Employment," or added by a merger or change in control event, the plaintiff could not determine with any certainty at the time that he signed the Employment Agreement the extent of the prohibition. *See Britt v. Davis,* 239 Ga. 747, 749, 238 S.E.2d 881 (1977); *Jarrett v. Hamilton,* 179 Ga.App. 422, 424–25, 346 S.E.2d 875 (1986) (holding that "a territorial limitation not determinable until the time of the employee's termination invalidates the provision and the entire agreement."). Finally, the covenant is also overbroad in the scope of activity prohibited, because it includes "any" business activity and thus is broader than necessary. *See Puritan/Churchill Chem. Co. v. Eubank,* 245 Ga. 334, 335, 265 S.E.2d 16 (1980); *see also Browning v. Orr,* 242 Ga. 380, 381, 249 S.E.2d 65 (1978).

Even assuming arguendo that the restrictive covenant should be analyzed under Delaware law, the defendants still fail. Under Delaware law, in general, an agreement by an employee not to follow his trade or business for a limited time and in a limited geographical area is not void as against public policy when the purpose of such agreement and its reasonable effect is to protect an employer from sustaining damages which an employee's subsequent competition may cause. *See Faw, Casson & Co. v. Cranston,* 375 A.2d 463, (Del.Ch. 1977) (citing *Capital Bakers v. Leahy,* 20 Del.Ch. 407, 178 A. 648, 649 (1935)). Such covenants, however, are subject to greater scrutiny when contained in an employment contract as opposed to contracts for the sale of a business. *See id.* (citing *Original Vincent and Joseph, Inc. v. Schiavone,* 134 A.2d 843, 845 (Del.Ch.1957)). Simply, restrictive covenants will not be enforced when they are unreasonable. *See id.* (stating that to be reasonable, a covenant must (a) be reasonable in time and scope; (b) be necessary for the protection of the employer; and (c) not impose an undue hardship on the employee).

Under Delaware law, the court finds that the restrictive covenant is unreasonable in its temporal, territorial, and prohibited activity scope. Under the defendants' reading of the Employment Agreement, the three year term of the Period of Employment was renewed on March 10, 1997, and thus the restrictive covenant was in effect until March 10, 2000, more than two years beyond the plaintiff's Termination date. Delaware law limits the parameters of time restrictions to no more than two years. *See id.; and see Knowles–Zeswitz Music, Inc. v. Cara,* 260 A.2d 171, 175 (Del.Ch.1969). Under the defendants' methodology, the court finds that the covenant is overly broad as to its time restrictions. The restrictive covenant purports to cover any business activity in competition with the defendants or its affiliates or subsidiaries in any geographic area in which the plaintiff provided or attempted to provide any products or services for the defendants. The court holds that the covenant's restrictions go well beyond that necessary for the protection of the defendants. Further, the court finds that it imposes an undue hardship on the plaintiff and thus is invalid, because "it is greater than is required for the protection for which the restraint is imposed [and], it imposes an undue hardship upon the restricted person." *Faw, Casson & Co.,* 375 A.2d at 467.

██ Georgia courts do not follow the "blue pencil theory of severability" of an unreasonable restriction in an employment contract. *See Browning,* 242 Ga. 380, 249 S.E.2d at 66 (citations omitted). Therefore, if any portion of the restrictive covenant is found to be unenforceable, then the entire covenant is illegal as well. *See id.* Because the Employment Agreement provides a severability clause, the court's ruling as to this issue does not affect the remainder of the Employment Agreement nor its enforceability. *See* Employment Agreement Attachment to Plaintiff's Motion for Partial Summary Judgment at Section 14 [Doc. No. 33–1] ("If any provi-

sion of this Agreement ... is held to be invalid ... the remainder ... shall not be affected ...."). Moreover, the invalidation of the covenant does not affect the parties' alleged intention to give it value and thus potentially exclude it under 26 U.S.C. § 280G.

Based on the foregoing analysis, the court finds that the restrictive covenant is invalid and unenforceable under Georgia law, because it is unnecessarily broad. Accordingly, the defendants may not proceed with their Third Defense that the plaintiff violated the restrictive covenant.

### 2. *Attorney's Fees*

With respect to the plaintiff's claim for attorney's fees, the plaintiff argues that under Section 8 of the Employment Agreement he is entitled to rely upon a letter of credit for attorney's fees, maintained and replenished by the defendants, in the event that the plaintiff must expend monies to recover under the Employment Agreement. Additionally, the plaintiff argues that he is entitled to recoup fees previously paid because the defendants voluntarily paid those fees. The plaintiff has drawn down on the letter of credit up to $150,000. The defendants counterclaimed, arguing that the plaintiff has unjustifiably resorted to a lawsuit to recover payments in excess of the amount to which he is entitled under the Employment Agreement. Thus, the defendants argue that Section 8 cannot reasonably be construed to mean that the plaintiff can file a lawsuit to recover payments to which he is not entitled and then charge the defendants with the litigation expenses. The defendants admit that their liability for fees if the plaintiff succeeds on his claim.

Section 8(a) unambiguously provides that the plaintiff may recover his attorney's fees for the defendants' failure "to comply with any of its obligations under" the Employment Agreement. Similarly, Section 8(b) provides that the defendant will establish an irrevocable standby letter of credit for the plaintiff's benefit in order to cover his incurred and ongoing costs

under Section 8(a). Further, Section 8(b) provides that such expenses shall be paid or reimbursed to the plaintiff on a regular and periodic basis upon the plaintiff's presentation of a statement of costs. Exhibit A to the Employment Agreement demonstrates that the letter of credit was contemplated to be capped at $1,200,000 and have an initially available amount of $150,000.

The defendants argue that they do not have to pay the plaintiff's fees, because they did not fail to comply with their obligations to pay the plaintiff. Section 8(a), however, does not provide that attorney's fees and expenses are limited to when the defendants have actually failed to pay the plaintiff. Rather, it provides that whenever "it appears to the Executive that the company has failed to comply with any of its obligations," the defendants must pay his attorney's fees and expenses as he incurs them in order to recover his allegedly denied compensation. Clearly, the plaintiff's subjective intent is the determining factor and not the merit of his claim.

Contrary to the defendants' assertions, the court finds that attorney's fees and expenses, paid via the replenishing letter of credit, is not contingent on the plaintiff's success in his action, but rather only on his choice to proceed with such an action. The only limiting factor on Section 8 is the plaintiff's alleged lack of good faith in filing the instant action. Section 8 does not explicitly require the plaintiff to have a good faith belief that he is entitled to a payment. Rather, again, only the plaintiff's subjective belief that he is so entitled is at issue. By filing this action, the plaintiff clearly manifests his belief that he is entitled to a payment under the Employment Agreement and that the defendants were obligated to pay and then failed to do so. Accordingly, the plaintiff is entitled to summary judgment as to whether he is entitled to payment of his reasonable attorney's fees and to replenishment of the letter of credit in accordance with Section 8 and as potentially limited by Letter of

Credit itself. Thus, the defendants must reimburse the plaintiff for attorney's fees and costs that he has thus far paid and must replenish the Letter of Credit, consistent with Section·8. By this holding, the court does not address any bad faith claim by the defendants against the plaintiff in order to recover these fees and expenses.

### 3. Defendants' Counterclaim

■ With respect to the plaintiff's remaining partial summary judgment issue, in their counterclaims, the defendants seek to recover payments made to the plaintiff under the SERP restrictive stock plan and attorney's fees that they have paid under a letter of credit, as required by Section 8 of the Employment Agreement. The plaintiff argues that recovery of the benefits is barred by the "doctrine of voluntary payment." Conversely, the defendants contend that because such payment was based on a contractual obligation under the Employment Agreement, the payment was not voluntary. The defendants also appear to assert that the plaintiff filed the instant suit in bad faith and thus they should not have to pay his attorney's fees under Section 8. The plaintiff counters that Section 8 does not contain any language of recovery of attorney's fees regardless of his intent in bringing the instant action. Having carefully considered the parties' briefs and their arguments as to disputed facts, the court finds that numerous issues of disputed material fact exist as to the voluntariness of that payment and whether the plaintiff brought the instant action in good faith, which precludes summary judgment.

### D. Defendants' Motion for Summary Judgment

#### 1. Covenant Not To Compete— 26 U.S.C. § 280G

■ Initially, the plaintiff contends that he is entitled to a payment attributable to a covenant not to compete in his employment agreement and that such a payment does not constitute a "parachute payment" within the meaning of I.R.C. Section 280G.

See 26 U.S.C. § 280G(b)(2)(A)(i-ii). The defendants counter that the contract payment was not intended to be made as consideration for the covenant not to compete and, even assuming so, a payment for a covenant not to compete is a "parachute payment" under I.R.C. Section 280G. This portion of the defendants' motion requires the resolution of a number of discrete issues that the court must resolve in order to answer the larger questions posed and, moreover, hopefully streamline this part of the litigation.

#### a. Applicable Standards to Section 280G

I.R.C. Section 280G defines "parachute payment" as follows:

(A) In general.—The term "parachute payment" means any payment in the nature of compensation to (or for the benefit of) a disqualified individual if—

(i) such payment is contingent on a change

(I) in the ownership or effective control of the corporation, or

(II) in the ownership of a substantial portion of the assets of the corporation, and

(ii) the aggregate present value of the payments in the nature of compensation to (or for the benefit of) such individual which are contingent on such change equals or exceeds an amount equal to 3 times the base amount.

26 U.S.C. § 280G(b)(2)(A). The statute was added to the Internal Revenue Code by the Deficit Reduction Act of 1984 in order to discourage the use of "golden" parachutes—payments to senior executives of a company in the event of a takeover. See Cline v. Commissioner of Internal Revenue, 34 F.3d 480, 481 (7th Cir.1994). Congress found that such payments hindered the "acquisition activity in the marketplace" by making target corporations less attractive to prospective suitors. Id. (citations omitted).

The legislative history of I.R.C. Section 280G establishes a presumption "that no parachute payment is reasonable compensation for personal services actually rendered." This presumption can be rebutted "only by clear and convincing evidence." *Id.* at 483–4 (internal quotations and citations omitted). The determination of what is "reasonable compensation" is a question of fact. *See RTS Investment Corp. v. Commissioner,* 877 F.2d 647, 650 (8th Cir. 1989) (per curiam); *see also Rutter v. Commissioner,* 853 F.2d 1267, 1271 (5th Cir.1988). The burden of proving the reasonableness of the compensation rests with the plaintiff. *See Hammond Lead Products, Inc. v. C.I.R.,* 425 F.2d 31, 33–4 (7th Cir.1970). The plaintiff submits that he expects to present at trial evidence, which is both clear and convincing, through the testimony of his expert witness that the value of the covenant that he seeks to recover is reasonable. The defendants argue that the clear and convincing burden is equally applicable to the threshold contention by the plaintiff that the parties intended the covenant to have value. The court disagrees.

The court holds that the applicable burden as to the intent of the parties with respect to the Employment Agreement and its covenant is the "preponderance of the evidence" standard. The intent of the parties is a contract issue, not subject to the statutory requirements of I.R.C. Section 280G. The defendants in fact admit as much in their brief, when they concede that the issue is "a matter of contract interpretation." Defendants' Memorandum of Law in Support of Substituted Motion for Partial Summary Judgment at 8 [Doc. No. 36–1]. Contrary to the broad reading of I.R.C. Section 280G argued by the defendants, in addition to the reasonableness of the amount inquiry, under I.R.C. Section 280G(b)(2)(C), the court must use the clear and convincing standard only to determine whether the plaintiff has overcome the statutory presumption that his compensation was contingent on change of ownership or control. *See*

*Sullivan v. Easco Corp.,* 662 F.Supp. 1396, 1400 (D.Md.1987). Accordingly, the plaintiff does not need to show by clear and convincing evidence that some part of the payment was intended to be compensation for the covenant not to compete.

### b. *Change in Control*

Whether a particular transaction involves a change in the ownership or effective control of a corporation or in the ownership of a substantial portion of its assets must be determined in light of all the facts and circumstances. *See Balch v. Commissioner of Internal Revenue,* 100 T.C. 331, 344, 1993 WL 106707 (1993) (citing H.R. REPT. NO. 98–861 (1984)). There is little guidance as to what constitutes clear and convincing evidence that a payment is not contingent on change of ownership or control. The court, however, finds that the payment at issue under the Employment Agreement expressly contemplates a change in control and, thus, is subject to I.R.C. Section 280G's parachute payment, unless the payment, or a part thereof, is excludable. *See* 26 U.S.C. § 280G(b)(4)(A).

### c. *Allocating Payment to Restrictive Covenant*

The defendants argue that the plaintiff cannot demonstrate that any part of the Section 5 payment is allocable to the covenant not to compete. They point out that the Employment Agreement does not expressly allocate any part of the payment to the covenant not to compete. Instead, the payment is calculated solely on the basis of what the plaintiff would have been paid had his employment continued for the balance of his term. Next, the defendants argue that the agreement describes a three-year employment contract at the same job level and pay, and does not mention the covenant not to compete. Then, the defendants argue that there is no incremental amount paid to the plaintiff by reason of his having become subject to the non-compete provision. Moreover, the defendants note that the plaintiff was already

subject to a more comprehensive restrictive covenant in a prior contract than that contained in Section 7, when he signed the Employment Agreement. They argue that it is highly unlikely that substantial termination payments would be made for a largely redundant covenant. Finally, the defendants point to the language of Section 6, which provides that the Section 5 payment is "severance compensation" and deemed "liquidated damages."

In opposition, the plaintiff points out that when OHM sought shareholder approval of the merger, it identified costs associated with the merger including executive payments which included payments for covenants not to compete. Next, the plaintiff shows that Philip Strawbridge's [2] termination payment included approximately $300,000 for his covenant not to compete. With respect to the Employment Agreement, the plaintiff argues that if an executive voluntarily resigns without justification, then he is not entitled to payments, but is not bound by the restrictive covenant. Hence, the plaintiff argues that if the non-compete obligation is conditioned on the payment, how can the converse not be true? Thus, the plaintiff concludes that if the payments or at least a part thereof are not allocated to the covenant, then the covenant is unsupported by consideration. Thus, according to the plaintiff, because the covenant was supported by consideration, any payment to the plaintiff in consideration for the covenant would not be in the nature of a prohibited severance payment under Section 280G.

In addition, the court notes that on January 20, 1998, Mr. Strawbridge sent a memo to numerous OHM executives, including the plaintiff, about the estimated change of control costs provided to IT during merger discussions. *See* MEMO Attachment to Plaintiff's Brief in Opposition to Defendants' Motion for Partial

Summary Judgment at 1 [Doc. No. 38–1]. Attached to that memo is E & Y's estimates of the value for the non-compete agreements of the executives, which states:

> Since there is no guidance in the Employment Agreement as to the value of the agreement not to compete, nor is there a specified method by which the value of the agreement not to compete is to be determined, it would be reasonable to apply standard valuation methodology.

*Id.* at 4. In its revised calculations "Section 280G analysis sheet," E & Y in footnote 1 explained that its estimate of the change in control consequences, under the Employment Agreement, for the plaintiff are "[b]ased on 154 weeks remaining in the Period of Employment after change of control date, less [the] value of covenant-not-to-compete." Ernst & Young LLP's OHM Corporation Preliminary IRC Section 280G Analysis Attachment to Plaintiff's Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 1 [Doc. No. 38–1].

During his deposition, Mr. Strawbridge admitted that he was paid $1.4 million, exclusive of stock options and all stock-related items, following the merger. He concedes that this payment included a portion as consideration for a noncompetition clause contained in his employment agreement, which was, as he understood things, to be "deducted from what would be considered an excess parachute payment." Deposition of Philip Strawbridge at 12–14.

Based on the foregoing facts, the court finds that at the very least there is some evidence that the defendants were aware that the Employment Agreement contemplated some set-off value for the restrictive covenant. Although the court recognizes that the parties dispute the intent, relevance and significance of the E & Y reports and Mr. Strawbridge's statements,

---

**2.** Mr. Strawbridge was the senior vice president, chief administrative officer of OHM and then IT. He left IT in September, 1999.

as the above recitation of arguments demonstrates, the parties clearly dispute numerous issues of fact. Thus, having considered the respective positions of the parties, the court finds that there are numerous disputed issues of material fact with respect to the interpretation of the Employment Agreement and the valuation, if any, of the covenant not to compete. Accordingly, the issue of whether any part of the restrictive covenant can be separately allocable from the payment due under Section 5 is inappropriate for summary adjudication.

### d. *Restrictive Covenants under Section 280G(b)(4)(A)*

■ Having found that the plaintiff is entitled to proceed on the issue of whether all or part of the payment contemplated by the Employment Agreement is attributable to the restrictive covenant, the court considers whether such a payment falls within I.R.C. Section 280G's exclusions from its "parachute payment" calculus. Assuming that the plaintiff can prove that part of the Section 5 payment was intended to be for the covenant not to compete, the defendants argue that would still not bring that portion of the payment within the I.R.C. Section 280G(b)(4)(A) exclusion. The plaintiff counters that I.R.C. Section 280G treats a covenant not to compete as the "performance of services." The court agrees that there is no controlling precedent on the issue of whether a covenant not compete is treated as the "performance of services" under I.R.C. Section 280G.

The defendants point out that in connection with the amendments to I.R.C. Section 280G both the United States House and Senate Reports use the following language to describe a parachute payment:

A 'parachute payment' is any payment (1) in the nature of compensation (including payments made under a covenant not to compete or similar arrangement); (2) to (or for the benefit of) a 'disqualified individual'; (3) if such payment is contingent on a change in the

ownership or effective control of a corporation . . . .

H.R. REP. NO. 99–426 at, 899 (1986); S.REP.NO. 99–313, at 915 (1986). Next, the defendants note that neither of these reports suggests that the phrase "compensation for personal services" includes a restrictive covenant. Thus, the defendants conclude that Congress is not likely to have included restrictive covenants in its definition of parachute payments only to exclude them as "compensation for personal services." The court, however, is cognizant of the rule "that the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

In opposition the plaintiff points to the legislative history of the Deficit Reduction Act and quotes the Act's explanation by Congress' Joint Committee on Taxation—the "Blue Book":

To the extent payments under such an agreement are . . . determined to be reasonable for the consideration (including consideration in the form of not competing) to be provided by the individual under the agreement, such payments are to be treated under the provisions as reasonable compensation for personal services actually rendered.

JOINT COMM. ON TAXATION DEFICIT REDUCTION ACT OF 1984, at 204 (December 31, 1984). Moreover, contrary to the defendants' recitation of the legislative history, the plaintiff contends that both the United States House and Senate Committee Reports on the 1986 amendments confirm that payments "in the nature of compensation" include "payments to be made under a covenant not to compete or similar arrangement." H.R.REP. NO. 99–426 at, 899 (1985); S.REP. 99–313 at, 915 (1986).

The overarching principle in all questions of statutory construction is the intent of the legislature. "First, always, is the question whether Congress has directly

spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The court must disregard administrative constructions that are inconsistent with clear legislative intent. *See Chevron, U.S.A., Inc.,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9.

Furthermore, when courts consider administrative constructions, they must divide those rulings into those that are "interpretive" and those that are "legislative." *CWT Farms, Inc. v. Commissioner of Internal Revenue,* 755 F.2d 790, 800 (11th Cir.1985). A legislative or substantive regulation is issued pursuant to specific authority and, thus, in effect implements the statute. These regulations have the same effect as a valid statute. *See Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977). By contrast, interpretive regulations stem from general statutory authority and must be in harmony with the origin and purpose of the statute. *CWT Farms, Inc.,* 755 F.2d at 801 (quoting *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982)). Deference to interpretive regulations depends upon various factors, including the timing and consistency of the agency's position. *See Batterton,* 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9. Still, agency regulations should be given some deference "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc.,* 467 U.S. at 844, 104 S.Ct. at 2782. More importantly, in the Eleventh Circuit, courts "owe great deference to the interpretations and regulations of ... the Internal Revenue Service." *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.,* 848 F.2d 1164, 1167 (11th Cir.1988) (en banc).

The court has carefully reviewed the plain language of the statute and the contradictory recitations of the Congressional reports and finds that the intent of Congress with respect to restrictive covenants under I.R.C. Section 280G is anything but clear. The parties have correctly pointed to legislative history pointing in both directions. Even if the court, however, assumes the ambiguity needle points in favor of the defendants' interpretation, the Supreme Court has instructed courts:

> [I]f a statute is silent or ambiguous with respect to the question at issue, our longstanding practice is to defer to the executive department's construction of a statutory scheme it is entrusted to administer, unless the legislative history of the enactment shows with sufficient clarity that the agency construction is contrary to the will of Congress.

*Japan Whaling Ass'n. v. Am. Cetacean Soc'y,* 478 U.S. 221, 233, 106 S.Ct. 2860, 2868, 92 L.Ed.2d 166 (1986) (internal quotations and citations omitted). Neither the Congressional reports, nor the amendments to the Deficit Reduction Act, sufficiently clarify Congress' intent. Given this statutory and legislative uncertainty, the court finds this to be an archetypical situation where regulations are permissible, provided they are otherwise reasonable. *See Lyons v. Georgia–Pacific Corp. Salaried Employees Retirement Plan,* 221 F.3d 1235, 1248 (11th Cir.2000).

Section 1.280G–1, "Q & A 11" of the 1989 Proposed Treasury Regulations for Golden Parachute Payments specifically addresses the issue, providing that "refraining from performing services (such as under a covenant not to compete or similar arrangement)" is deemed to be compensation for the performance of services. *See* Priv. Ltr. Rul. 93–14–034 (Jan. 8, 1993). Moreover, if a taxpayer establishes by clear and convincing evidence that the amounts attributable to such a covenant are reasonable, they would not qualify as parachute payments under section 280G(b)(2)(A). Priv. Ltr. Rul. 93–14–034

at 4–5. Although private letter rulings may not be used or cited as precedent, they are "properly cited as evidence of how the Commissioner has interpreted the law in the past." *Estate of Monroe v. C.I.R.*, 124 F.3d 699, 709–710 (5th Cir. 1997); *see* 26 U.S.C. § 6110(k)(3); *but cf. Hickey v. Chicago Truck Drivers, Helpers & Warehouse Workers Union*, 980 F.2d 465, 469 (7th Cir.1992) ("Given the informal nature of these letters, the express limitations included in the IRS letter, and the absence of any reasoning to explain the basis for the statements, we do not think that any implication in either of these letters ... is entitled to deference."); *and see In re Gulf Pension Litigation*, 764 F.Supp. 1149, 1172 (S.D.Tex.1991) ("[T]he Court also finds that the IRS determination is due no deference because it evidences no investigation or legal analysis of the facts by the IRS.").

The court recognizes that the private letter ruling is based on a different set of facts. However, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron, U.S.A., Inc.*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. Because Congress has not spoken directly to the precise issue, because the legislative history is ambiguous, and because the court finds that the Proposed Treasury Regulations and the Private Letter Ruling are reasonable interpretations of I.R.C. Section 280G, the court holds that restrictive covenants fall within the meaning of the I.R.C. Section 280G(b)(4)(A) exclusion. *See Lyons*, 221 F.3d at 1249.

### e. *Reasonable Compensation under Section 280(b)(4)(A)*

■ If the plaintiff successfully demonstrates that part of his termination payment was for the restrictive covenant, the next question presented is whether such remuneration is deemed reasonable com-

pensation for personal services. I.R.C. Section 280G(b)(4)(A) provides that:

> the amount treated as a parachute payment shall not include the portion of such payment which the taxpayer established by clear and convincing evidence is reasonable compensation for personal services to be rendered on or after the date of the change described in paragraph (2)(A)(i) . . . .

Under that section, the court must consider the circumstances surrounding the Employment Agreement and the events leading up to its formation in determining whether the plaintiff, by clear and convincing evidence, has established such payment to be "reasonable compensation" for personal services to be rendered after the date of the change in ownership and control. *See Balch*, 100 T.C. at 349–50. In its General Explanation of the Deficit Reduction Act of 1984, the staff of the Joint Committee on Taxation included the following three factors in determining whether compensation is reasonable in the case of an employment contract: "the individual's historic compensation, the duties to be performed under the contract, and the compensation of individuals of comparable skills outside of an acquisition context." *Balch*, 100 T.C. at 350 (quoting STAFF OF JOINT COMM. ON TAXATION, GENERAL EXPLANATION OF THE REVENUE PROVISIONS OF THE DEFICIT REDUCTION ACT OF 1984, 204 (J.Comm. Print 1984)).

Keeping in mind that he must overcome the clear and convincing requirement, the plaintiff argues that he is entitled to show, through expert testimony, that part of the Section 5 payment was reasonable consideration/payment for his personal services to be performed under Section 7's covenant not to compete, and hence doesn't count towards the 280G ceiling. Although the court has found that the compensation, including any alleged payment for the covenant not to compete, received by the plaintiff is expressly made contingent on a change of ownership or control of OHM by

the Employment Agreement, there are disputed material issues of fact as to the reasonableness of such payments "for personal services to be rendered on or after the date of the change" in control. 26 U.S.C. § 280G(b)(4). Thus, the plaintiff is entitled to present his evidence of the reasonableness of such compensation at trial. Accordingly, the court finds that summary adjudication on whether the plaintiff has failed to rebut the presumption that no parachute payment is reasonable compensation is inappropriate.

### 2. *Deferred Compensation Plan*

The defendants seek summary judgment on the plaintiff's claim in Count II for benefits under the Retirement Incentive Compensation Plan (the "Plan"), administered by OHM, contending that the plaintiff's claim, if treated as a common law breach of contract action, is preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(a) ("ERISA"). Alternatively, the defendants argue that if the claim is treated as a claim for benefits under ERISA, then the plaintiff still cannot recover, because the denial of his claim by the Plan's Administrator was not an abuse of discretion. Simply, the defendants contend that his claim was properly denied, because he failed to follow the Plan's written deferral election procedures. In rebuttal the plaintiff argues that the defendants are equitably estopped from requiring him to comply with the Plan's requirement of providing the deferral election form prior to the beginning of each "Plan Year," because they had previously allowed him to orally defer and then provide the written deferral later.

The defendants correctly point out that it is difficult to determine the basis of the plaintiff's count—state law breach of contract or for benefits under ERISA. The court recognizes that many of the allegations in an ERISA claim will be similar to the allegations in a state law breach of contract claim, because in a permissible ERISA Section 502(a)(1)(B) claim, a participant/beneficiary under a plan com-

mences an action to assert his contractual rights under the plan and also alleges that the defendant failed to abide by the terms of the plan. *See e.g. Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1133 (7th Cir. 1992) (citation omitted); *and see* 29 U.S.C. § 1132(a)(1)(B). Based upon a review of the plaintiff's complaint, the court finds that while imprecisely expressed he has filed both a state law breach of contract claim and a claim for benefits under ERISA.

#### a. *Preemption*

 "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Relying on ERISA Section 514(a), the defendants contend that so much as the plaintiff seeks to recover through a state law breach of contract theory, his claim is preempted by ERISA. *See* 29 U.S.C. § 1132(a)(1)(B).

The Act's preemption clause is deliberately expansive, providing that it "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan ...." 29 U.S.C. § 1144(a). Although the term "relate to" is quite broad, it is not unlimited. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (explaining that "relate to" should not be "taken to extend to the furthest stretch of its indeterminancy"). Furthermore, "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. 2890, 77 L.Ed.2d 490; *see also Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 833, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (explaining that ERISA does not preempt "run-of-the-mill state-law claims," even though such suits obviously affect and involve the plan). Moreover, the Eleventh Circuit recognizes

the Supreme Court's trend in reversing the tide of "expansion of the preemption doctrine." *Morstein v. National Ins. Serv., Inc.,* 93 F.3d 715, 721 (11th Cir.1996) (en banc); *see also Whitt v. Sherman Int'l Corp.,* 147 F.3d 1325, 1333 (11th Cir.1998) (noting the recent change "in courts' willingness to apply the preemption doctrine expansively").

The court, however, finds that the instant state law claims plainly address areas of exclusive federal concern, specifically the right to receive benefits under an ERISA plan and claims directly affecting the relationship among traditional ERISA entities—an employer and a plan participant. *See Morstein,* 93 F.3d at 722; *and see Jackson v. Martin Marietta Corp.,* 805 F.2d 1498 (11th Cir.1986) (per curiam) (explaining that ERISA preempts all state laws that impact on the administration of an employee benefit plan); *see generally Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 245 (5th Cir.1990). Moreover, the court finds that the defendants and thus the Plan administrators are ERISA entities within the meaning of 29 U.S.C. § 1002(21)(A). Therefore, the court finds that the plaintiff's state law claims fall within ERISA's preemptive scope, because they have a sufficient connection with the Plan so as to "relate to" the Plan. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

b. *Abuse of Discretion*

■ With respect to the plaintiff's claim that he is due benefits from the Plan, which is governed by ERISA, the defendants contend that the Plan's administrator followed the explicit terms of the Plan, as required by 29 U.S.C. § 1104(a)(D). ERISA does not provide a standard to review the decisions of a plan administrator. The Supreme Court, however, in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), looked to the principles underlying trust law as largely defining the role and responsibilities of a plan administrator.

*See Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1449 n. 1 (11th Cir.1997) (citing *Brown v. Blue Cross & Blue Shield of Ala.,* 898 F.2d 1556, 1560 (11th Cir.1990)) (holding that the standard of review applicable to determinations rendered under an ERISA-governed plan "applies equally to the decisions of fiduciaries and the plan administrator"). Consistent with the Supreme Court's directives, the Eleventh Circuit "adopted three standards of review for plan interpretations: (1) de novo, applicable where the plan administrator is not afforded discretion, (2) arbitrary and capricious when the plan grants the administrator discretion, and (3) heightened arbitrary and capricious where there is a conflict of interest." *Paramore,* 129 F.3d at 1449–50 (citations omitted).

■ Here, the Plan provides that the OHM Board of Directors determined whether or not to grant stock options based upon recommendations from Philip Strawbridge and Jim Kirk, OHM Officers. The OHM Administrative Committee decided not to grant the plaintiff's stock options based upon an Internal Revenue Service regulation and the plaintiff's failure to comply with election procedures. The court finds that this decision involved discretionary decisions made by parties with a conflict of interest—overlapping duties to a plan beneficiary and OHM. *See* Deposition of Philip Strawbridge at 77–79; *and see Shannon v. Jack Eckerd Corp.,* 113 F.3d 208, 210 (11th Cir.1997) ("Denial of benefits under an ERISA plan that gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan is reviewed by the district court for abuse of that discretion."); *and see Jett v. Blue Cross & Blue Shield of Ala., Inc.,* 890 F.2d 1137, 1139 (11th Cir.1989) (holding that there is no distinction between the arbitrary and capricious and the abuse of discretion standard). Accordingly, the court applies the heightened arbitrary and capricious abuse of discretion standard to the decision to deny the plaintiff a deferral

payment. In doing so, the court's inquiry is cut short, because the court finds that the oral deferral in 1997 followed by a written deferral in 1998 was not permitted by the Plan. *See* Plan at Article 2, Section 2. If the administrator's interpretation of the Plan was legally correct, the court's inquiry ends. *See Adams v. Thiokol Corp.*, 231 F.3d 837, 842 (11th Cir.2000) (citing *Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th Cir.1997)). Accordingly, the court holds that the administrator's decision was not an abuse of discretion.

### c. *Equitable Estoppel*

■ The plaintiff contends that for each year prior to the merger with IT, the Plan's participants accomplished the deferral of bonus compensation by giving oral notification to OHM and then, later, confirmed that notification in writing. The plaintiff argues that he followed this traditional procedure on his 1997 bonus, by giving oral notice in 1997 and then giving written notice in 1998. It is undisputed that after the OHM/IT merger the Plan was interpreted to disallow the plaintiff's 1997 deferral. The plaintiff argues that this was done to save the defendants money and deprive him of his rightful bonus. Thus, the plaintiff concludes that because of their alleged past practice the defendants are equitably estopped from now interpreting the Plan to have required written notification in 1997.

The Eleventh Circuit has noted that ERISA, although a federal "comprehensive" employee benefit program, contains interstices which the federal courts are expected to fill-in with a "federal common law of rights and regulations under ERISA—regulated plans." *Glass v. United Omaha of Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir.1994) (citing *Pilot Life Ins. Co.*, 481 U.S. at 56, 107 S.Ct. at 1557). In filling in these gaps, the Eleventh Circuit "[has] created a narrow common law doctrine under ERISA for equitable estoppel when (1) the provisions of the plan at issue are ambiguous, and (2) representations are made which constitute an oral interpretation of the ambiguity." *Id.* (citing *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285–86 (11th Cir.1990)). Accordingly, equitable estoppel is not available for unambiguous written plans or oral modifications of the plan. *Id.* (citing *Alday v. Container Corp.*, 906 F.2d 660, 666 (11th Cir.1990)); *and see Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986).

The portion of the Plan at issue provides:

> As a condition of participation, each Participant must complete and return to the Administrative Committee, a Deferral Election Form in which the Participant specifies the portion of the Participant's Compensation (as defined below) that is to be deferred under the Plan during the following calendar year .... The Deferral Election Form shall be delivered to the Administrative Committee prior to the beginning of each Plan Year .... "the participant shall designate, prior to the beginning of each Plan Year, the amounts and percentages to be contributed to the Participant's Retirement Deferral Account and OHM Common Stock Deferral Account."

Plaintiff's Brief In Opposition to Defendant's Motion for Partial Summary Judgment at 17 [Doc. No. 38–1]. The court finds that the Plan is unambiguous and patently mandates written notification during the year preceding the calendar year in which the elections are to apply. *See Dahl–Eimers v. Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993) (finding that the determination and resolution of ambiguities in a contract is a question of law for the court). With respect to modification, the plaintiff contends that the defendants either orally or through their conduct modified the year-in-advance requirement. As explained, such oral modifications are not grounds for the application of equitable estoppel. *See Glass*, 33 F.3d at 1347. Accordingly, the court finds that the plaintiff's equitable

estoppel argument fails and, thus, the defendants are entitled to summary judgment as to Count II of plaintiff's complaint.

### 3. *Bad Faith & Emotional Distress*

 Finally, the defendants seek summary judgment on the plaintiff's claims in Count IV that he is entitled to damages for emotional distress and that he is entitled to litigation expenses under O.C.G.A. § 13–6–11, contending that damages for emotional distress cannot be recovered in an action for breach of contract, and that there existed a bona fide controversy between the parties and the defendants did not act in bad faith in its handling of the plaintiff's contract payments. The court agrees that the plaintiff may not recover on his emotional distress claim. With respect to attorney's fees, the plaintiff counters that despite their alleged good faith negotiation the defendants never intended to fulfill their obligations and continued negotiations in an attempt to gain leverage over him. Having reviewed the parties briefs, the court finds that the plaintiff has shown sufficient record evidence that would permit a reasonable jury to find that the defendant acted in bad faith under Section 13–6–11. Accordingly, summary judgment is inappropriate.

### III. CONCLUSION

For the foregoing reasons, the court hereby GRANTS IN PART and DENIES IN PART the plaintiff's motion for partial summary judgment [Doc. No. 33–1]. Further, the court GRANTS IN PART and DENIES IN PART the defendants' motion for partial summary judgment [Doc. No. 36–1].

Specifically, the court grants the plaintiff summary judgment as to the defendant's Third Defense that the plaintiff violated the restrictive covenant. Further, the plaintiff is entitled reimbursement under Section 8 of the Employment Agreement and replenishment of the letter of credit. The plaintiff, however, is not enti-

tled to summary judgment on the defendants' counterclaim.

The defendant is entitled to summary judgment as to Count II of the plaintiff's complaint. Further, the defendant is entitled to summary judgment on Count IV so far as the plaintiff seeks recovery for an emotional distress. The defendant, however, is not entitled to summary judgment on Count I of the plaintiff's complaint, nor Count IV so far as the plaintiff seeks recovery under O.C.G.A. § 13–6–11.